**MERRITT–CHAPMAN & SCOTT CORPORATION, etc., Libelant,**

v.

**THE Tug LION, her engines, boilers, etc., Respondent.**

United States District Court
S. D. New York.
Dec. 3, 1957.

Haight, Gardner, Poor & Havens, New York City, for libelant.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for respondent.

THOMAS F. MURPHY, District Judge.

Libelant claims damages as a result of the tug Lion directing her tow so as to come in contact with the easterly abutment of the substructure for the Tappan Zee Bridge across the Hudson River between Tarrytown and Nyack, New York.

On September 17, 1953, libelant was engaged in the construction of the Tappan Zee Bridge and on that day the abutments to support the eventual span had already been completed. Extending in a northerly direction from each abutment was a structure known as an icebreaker designed to break up ice floes descending the Hudson River. The main channel between abutments and icebreakers was 1,200 feet wide. The icebreakers, as seen from a northerly approach, had red and green lights which could be seen, according to conflicting testimony, from one-half to three-quarters of a mile away.

Some time after midnight on September 17, 1953, the tug Lion, towing 17 barges in tiers of two, each barge approximately 90 feet in length and loaded with traprock, approached the channel between the abutments headed in a southerly direction. The tide was ebbing with an easterly set to the current. The wind was northwest approximately 20 miles per hour. The tow had a helper tug.

It is the contention of libelant that the tug and its tow was so navigated that the last barges in line struck the east icebreaker causing the damage complained of.

The claimant's position is that the Lion's tow did not cause the icebreaker damage, or, if it did, the damage resulted solely from libelant's statutory fault in failing to light the icebreaker adequately, and that libelant failed to prove negligence in the navigation of the tug Lion.

There is no dispute that the icebreaker in question was substantially damaged. The captain of the tug Lion admitted that the last part of his tow brushed slightly against the icebreaker and the captain of the helper tug, who was nearest to the scene, testified that there was a slight contact made by a number of the barges at the tail end of the tow. Admittedly no damage of any consequence was suffered by any of the barges.

The first issue is whether the damage was caused by the tug Lion and its tow or by some other tow or cause. The proof on this issue was divided into two phases: (1) the time element, and (2) the comparison of the damage between the icebreaker and the barges.

The captains of the tug Lion and the helper tug testified that 12:30 A.M. was the time of passage through the abutments. This was corroborated to some degree by the entries in their respective logs in which each recorded 12 Midnight as the time they were abeam Tarrytown Light.

At the Coast Guard hearing Leach, the employee of libelant (deceased at the time of trial) fixed the time at 1:15 A.M. His log, however, fixes the time at 1:30 A.M. and, incidentally, identifies the wrong but similar tug. Also in his log he records that a tug and its tow went through at 2:20 A.M. and that a helper tug went to Cooney's, which is where the Lion's helper tug went, according to her captain's testimony, at 12:50 A.M. and 40 minutes later rejoined the tow. He also records that at 2:40 A.M. he noticed that the red light on the icebreaker was out and at daybreak observed that it had been knocked off the pier and the icebreaker damaged. Another fact dealing with the time element is a letter from the libelant to the Coast Guard dated September 22, 1953, stating

that the icebreaker was damaged by a tug and tow at approximately 1:15 A.M. on September 17, 1953, and that at 1:38 A.M. its employee noticed the light was no longer visible.

From such vague and conflicting testimony, partly oral, partly excerpts from stenographic transcript and partly from logs, we must decide the first issue: Did the tug Lion and her tow do the damage? We find that it did, although with some difficulty because of the apparent conflict in libelant's employee's log entries. We resolve easily enough the conflict of time between 12:30 and 1:15 because we do not accept the tug Lion's captain's estimate of his speed over the ground at the time. The entries in the libelant's employee's log impress us as having been made after the fact and not necessarily inconsistent with the fact that the Lion's tow did the damage. The argument and "expert" opinion that since the barges sustained no damage ergo the damage to the icebreaker could not have been occasioned by the barges coming in contact is not impressive. These barges were loaded with traprock and weighed approximately 1,200 tons each, which weight, particularly when moving, is a compelling factor to permit us to draw the inference that they caused the damage.

The next issue relates to the lights. A witness, formerly of the Coast Guard, testified that after the accident and on September 21, 1953, he made personal observations and that he could not see the lights two miles north but as he descended the river he could see them one-half or three-quarters of a mile away and he recommended flashing lights, which were subsequently installed.

A number of Hudson River pilots also testified that the lights were inadequate prior to the accident, and prior to the accident had complained to libelant about them and had predicted trouble. The pilot of the tug Lion, an experienced Hudson River pilot, had successfully and without incident made passes through the abutment at least seven times that month prior to the accident, and although he admitted seeing the lights only a quarter of a mile away we are convinced that he saw them at least three-quarters of a mile away, and that he was not confused by the lights of the towns below the bridge. He knew the tide was ebbing at the time; that the tide had an easterly set; that he was on the easterly side of the channel, and that his tow was not in a straight line behind him.

Libelant proved to our satisfaction that prior to the accident it had installed lights operated by batteries; that this was done with the approval of the Army Corps of Engineers, and that it gave adequate warning by appropriate notice to mariners.

Whether these lights could be seen at a distance of 2,000 yards is questionable, but we are convinced that they could be seen at least three-quarters of a mile away and were seen by the captain of the tug Lion, and if inadequate were not the cause of the casualty. If the inadequacy of the lights was a statutory fault they did not in fact cause the accident. The accident was caused solely by the negligence in the navigation of the tow under the circumstances of the weather and tide existing that night. The captain should have kept more to the west in view of the set of the current and the strength of the northwest wind. Failing so to do he was guilty of faulty navigation.

Decree for libelant with costs.